IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 11, 2017 Session

## STATE OF TENNESSEE v. ASHTON BUFORD, DEVANTE TERRELL and MELVIN HOPKINS

**Appeal from the Criminal Court for Shelby County**
**No. 13-02392      W. Mark Ward, Judge**

_____

### No. W2016-01387-CCA-R3-CD

_____

A Shelby County Criminal Court Jury convicted the Appellants, Ashton Buford, Devante Terrell, and Melvin Hopkins, of two counts each of first degree felony murder; one count each of especially aggravated kidnapping, a Class A felony; and one count each of aggravated robbery, a Class B felony. The trial court merged the felony murder convictions, and the Appellants received effective sentences of life in confinement. On appeal, the Appellants contend that the trial court erred by deleting "killing" from portions of the jury instructions for first degree felony murder; by denying severance motions, admitting evidence of codefendants' statements, and failing to give a limiting instruction in violation of Bruton v. United States, 391 U.S. 123 (1968); and by allowing the State to engage in improper jury voir dire and closing arguments. In addition, Appellant Buford contends that the trial court erred by failing to list the elements for the underlying felonies in the jury instructions for first degree felony murder, that the trial court erred by failing to instruct the jury on facilitation of the charged offenses, that the evidence is insufficient to support his convictions of first degree felony murder and especially aggravated kidnapping, and that cumulative error warrants a new trial. Based upon the oral arguments, the record, and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Phyllis Aluko (on appeal) and Constance Barnes and Kathy Kent (at trial), Memphis, Tennessee, for the appellant, Ashton Buford; Seth M. Segraves and Michael R. Working, Memphis, Tennessee, for the appellant, Devante Terrell; and Arthur E. Horne (on appeal and at trial) and Carlissa Shaw (at trial), Memphis, Tennessee, for the appellant, Melvin Hopkins.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Greg Gilbert and Omar Malik, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

This consolidated appeal relates to the beating, robbery, and kidnapping of sixty-one-year-old Jessie Wilson on July 25, 2012.  The victim died on September 30, 2012.  In May 2013, the Shelby County Grand Jury indicted the Appellants for first degree felony murder committed during the perpetration of or the attempt to perpetrate robbery in count one, first degree felony murder committed during the perpetration of or the attempt to perpetrate kidnapping in count two, aggravated robbery in count three, and especially aggravated kidnapping in count four.  Counts one and two also named a fourth defendant, Robert Armstrong, who was fifteen years old at the time of the crimes.

Before trial, Appellant Buford filed two motions to sever his trial from that of his codefendants due to written confessions given by Appellants Buford and Terrell, and Armstrong entered into an agreement with the State to testify against the Appellants in exchange for a guilty plea to facilitation of first degree felony murder and a sentence of thirteen and one-half years as an especially mitigated offender.  On the morning of the first day of trial, the trial court denied Appellant Buford's motions to sever and ruled that the Appellants' confessions, redacted to remove any references to codefendants, were admissible.

At trial, Lenwood Reed testified that he knew the victim for one year to eighteen months, that they met "through ministry," and that he talked with the victim on a regular basis.  Reed last saw the victim on or about July 24, 2012, and the victim did not complain about any health issues.  On the evening of July 25, the victim contacted Reed because he owed Reed $100.  The victim told Reed that Reed could come to the victim's apartment to get the money, and Reed told the victim that he would come after work.  When Reed got off work about 10:30 p.m., he telephoned the victim.  Reed said "[a] young man" answered and told him the victim was not there.  Reed responded that the victim had to be there because the victim did not go out at that time of night.  The young man said the victim had gone to the store and hung up.  Reed telephoned the victim again, but the call went to voicemail.

Reed testified that the call "stayed on" his mind.  The next morning, he and a friend went to the victim's apartment building.  The apartment manager took them to the

victim's apartment, and a maintenance man "popped the door open." Reed went inside and saw that the apartment had been "ransacked." He could hear the victim moaning and found the victim lying on the bathroom floor. The victim was swollen, and blood was on his face. Reed said the victim looked "[t]otally different" from the victim's appearance on July 24.

Reed testified that he visited the victim in the hospital on July 27 and that the victim did not respond to him. A couple of days later, Reed visited the victim again. The victim did not recognize Reed and still did not respond. Reed visited the victim after the victim was transferred to long-term care but never got a response from him.

On cross-examination by counsel for Appellant Buford, Reed testified that the victim helped him with issues at his church and that he took the victim grocery shopping sometimes. He did not go into the victim's apartment often, and he was unaware the victim had a roommate. When Reed telephoned the victim on the night of July 25, Reed did not recognize the young man's voice. He said he knew the young man's story was untrue because the victim did not go out after dark. On the morning of July 26, Reed and his friend went to the back door of the victim's apartment building and knocked on the door; the manager let them into the building. Reed said he did not remember if he tried to pull on the door to see if it would open.

On cross-examination by counsel for Appellant Hopkins, Reed acknowledged that he and the victim were "pretty good friends" but that he did not know much about the victim and never met the victim's family. On cross-examination by counsel for Appellant Terrell, Reed acknowledged that the maintenance man did not use a key to open the victim's apartment door.

Officer Michael England of the Memphis Police Department (MPD) testified that about 10:30 a.m. on July 26, 2012, he and another officer responded to a call at the victim's apartment and went to the front door of the building. He stated, "I don't remember if that [door] had a buzzer or not. I think we just walked in." The officers went to the victim's apartment on the seventh floor, and Officer England saw fire department personnel bringing out the victim on a gurney. The victim was wearing a neck brace and an oxygen mask, had blood on his face, and was making "a gurgling sound." Officer England tried to ask the victim a question, but he was unresponsive.

On cross-examination by counsel for Appellant Hopkins, Officer England testified that he spoke with the victim's neighbor, who said he heard "banging coming from down the hall" about 9:00 p.m. The neighbor stepped out of his apartment and saw two males walking away from the area of the victim's apartment and toward the elevators. One of the males was wearing a white t-shirt, and the other was wearing "a green jersey style

shirt." The neighbor did not see their faces because they had their backs to him. Officer England also spoke with a maintenance man, who showed him damage to the victim's front door. The maintenance man had "dismantle[d] the door" to gain entry to the victim's apartment. Officer England did not inspect the back door of the apartment building.

James Schafer, a retired sergeant from the MPD, testified that he investigated the case and went to the victim's apartment about 11:30 a.m. on July 26, 2012. Other officers were present, and the victim had been transported to a hospital in critical condition. The knob on the front door of the apartment was missing, and the door's lock had been damaged. Sergeant Shafer entered the apartment through the kitchen and noticed that cabinet drawers and doors were open. He went into the living room and saw what appeared to be blood. "[M]ore blood" was in the bedroom, and the bedroom door had "a large dent in it." Sergeant Shafer entered the bathroom and noticed a large amount of blood and two neckties. He said the entire apartment had been ransacked as if "[s]omebody was searching for something."

Sergeant Shafer testified that another officer already had "pulled" video of two potential suspects. Sergeant Shafer viewed the video, which was recorded on July 25, and it showed two males entering the back door of the victim's apartment building. One of them "had taken his shirt and covered up his face as if not wanting to be seen or identified." Sergeant Shafer obtained a still photograph of the suspects from the video and released it to the media. One or two days later, Robert Armstrong, who had turned fifteen years old on July 25, and Jerrico Ware, who was seventeen years old and Armstrong's cousin, came to the police department and spoke with Sergeant Shafer. Ware admitted that he was the individual in the video with the shirt covering his face.[1] However, he claimed he was not present when the victim was assaulted. Armstrong gave an incriminating statement to Sergeant Shafer. Based on Armstrong's statement, Sergeant Shafer began looking for the Appellants and Terrell Vaughn.

Sergeant Shafer testified that he viewed a second video from the apartment building and that the second video was recorded earlier on July 25 than the first video. The second video showed four suspects entering the back door of the building and was consistent with Armstrong's statement.

The State played the second video for the jury. Sergeant Shafer testified that the video showed Robert Armstrong entering the building first, followed by Appellant Terrell, who was wearing a backpack; Appellant Buford; and Appellant Hopkins. Although the door to the building had a security system, the system was broken so that

---

[1] Terrell Vaughn turned out to be the second individual in the video.

- 4 -

they just "had to pull on it a couple of times to get in." The State then played a third video, which showed the four of them getting onto an elevator on the ground floor of the building and the elevator doors closing. An electronic indicator above the doors showed that the elevator went up to the seventh floor, the floor on which the victim's apartment was located. Less than five minutes later, the elevator doors opened on the ground floor, and the four males exited the elevator. Sergeant Shafer said that when Appellant Terrell exited the elevator, "it's obvious that [his backpack] has some stuff in it as compared to when they first went up."

Sergeant Shafer testified that the police arrested Appellant Buford and brought him to the police department. Sergeant Shafer advised Appellant Buford of his rights, and Appellant Buford agreed to speak with him. During the interview, Appellant Buford admitted being involved, stating, "I was searching the front room near the couch for more money. I went into the refrigerator and got some juice and oatmeal pies. . . . [The victim] wasn't saying anything but it sounded like he was snoring." Sergeant Shafer asked Appellant Buford if he was concerned about the victim at that time, and Appellant Buford answered, "No, sir. I was just trying to get out and leave." Appellant Buford said that the victim was lying on the bathroom floor, that the victim "only had a couple of knots on his face," and that he never sought help for the victim. Sergeant Shafer asked Appellant Buford "[e]xactly how much money and what other property" were taken from the victim, and Appellant Buford answered, "$141 and some food." Appellant Buford did not know the victim prior to July 25.

Sergeant Shafer testified that Appellant Terrell turned himself in to the police, that he advised Appellant Terrell of his rights, and that he interviewed Appellant Terrell. Appellant Terrell said he learned from Terrell Vaughn that the victim "was going to get some money." Appellant Terrell telephoned the victim, and the victim thought Appellant Terrell was Terrell Vaughn. Appellant Terrell told the victim that he would "be over there about seven or eight." Appellant Terrell went to the victim's apartment and knocked on the door. When the victim opened it, Appellant Terrell "just busted in on him." The victim was yelling, "[S]top hitting me, what you hitting me for[?]" Blood was coming out of his mouth, and he was "breathing hard." Appellant Terrell said he was concerned about the victim because "there was too much blood coming out of his mouth." Appellant Terrell said he took $140, a telephone, and "juices" from the victim and that the items were in his backpack. He said he did not know the victim and had not been in the victim's apartment prior to July 25.

Sergeant Shafer testified that he initially charged the Appellants and Armstrong with especially aggravated robbery and especially aggravated kidnapping. However, the victim died on September 30, 2012, so Sergeant Shafer added charges of first degree

murder. He said he never obtained a statement from the victim because the victim never regained consciousness after July 25.

On cross-examination by counsel for Appellant Buford, Sergeant Shafer testified that he did not remember if he interviewed Terrell Vaughn and that individuals named "Brandon" and "Kavorious" also were suspects. On cross-examination by counsel for Appellant Hopkins, Sergeant Shafer testified that he never went to the hospital to try to talk to the victim. Instead, he telephoned the medical staff often, sometimes twice per day, to find out if the victim was conscious. He said he was unaware that the victim was ever conscious after July 25. On cross-examination by counsel for Appellant Terrell, Sergeant Shafer testified that he learned from the victim's neighbor that Kavorious had lived with the victim at some point. However, the day before the victim was attacked, Kavorious went to the bus station and left town. The neighbor provided Sergeant Shafer with a description of Kavorious, but Sergeant Shafer never obtained video from the bus station.

On redirect examination, Sergeant Shafer described the victim's assault as "brutal." He said that the victim was beaten with hands, not a weapon, and that the victim suffered due to the attack.

Officer David Galloway of the MPD testified that he went to the victim's apartment on July 26, 2012, and "[swabbed] the scene" for evidence, specifically blood and DNA. He collected at least ten swabs from various locations in the apartment. He also attempted to collect fingerprints but did not find any prints of value.

Carolyn Washington, the victim's daughter, testified that the victim was diagnosed with sarcoidosis of the lungs when he was "in his 30s," an enlarged heart in 2006 or 2007, and HIV in 2009. She said she saw him about twice per week and talked to him on the telephone every day. On July 25, 2012, Washington took the victim to run errands, and he walked his two granddaughters to the park. He was not having any trouble walking or talking that day. About 9:00 a.m. on July 26, Washington received an emergency telephone call from one of the victim's friends. She said she was "shocked" by the call because the victim was "fine" the previous day.

Washington testified that she went to the hospital and that the victim's "face and everything was just swollen and his eyes [were] swollen shut and [he] had a collar around his neck." Washington talked to the victim, but he did not recognize her and would not respond. He tried to open his eyes, but they were too swollen. He had a tube in his throat that was connected to a breathing machine, a tube in his stomach because he could not feed himself, and a catheter. Washington said, "Every now and then he was there but he wasn't there." She stated that the victim "was constantly trying to get away because he

- 6 -

[was] thinking someone was coming for him," that he pulled the tubes out of his body, and that he had to be restrained. At some point, the victim indicated that he wanted the breathing tube out of his throat, so doctors removed it and performed a tracheotomy. Washington said that the bones in the victim's face were broken and that she heard "rattling noises" when he moved his head.

Washington testified that two weeks later, the victim was moved into long-term care at a second hospital. The ultimate goal was to move him into rehabilitation so that he could learn to walk and go home. However, one of his eyes became infected and did not improve. The victim had an "eye issue" prior to July 25 due to his HIV. An infection developed in his bloodstream, and he was transferred to hospice care. One night, the victim vomited into his trachea. Washington said that "he just turned for the worst and everything started to just shut down and everything started to get worse." On September 29, the victim had a seizure that lasted more than one hour, and his doctor told Washington that the victim's heart had "started to fade." The victim died the next day, September 30, 2012. Washington said that he never was able to talk after July 25 but that he could respond to her by grabbing her hand or making noises. She said Sergeant Shafer would have been unable to have taken a statement from the victim.

On cross-examination by counsel for Appellant Buford, Washington testified that prior to July 25, the victim also suffered from sinus problems and asthma and was taking nine or ten medications per day. He received a disability check every month, and he fixed televisions in his apartment "[o]n the side." The victim had a roommate briefly, but Washington never met him. On July 26, 2012, Washington's mother also went to the hospital, and the victim recognized her. After three or four days in intensive care, the victim recognized Washington. Washington said she would talk to the victim about his medical care and that she thought he understood her because he would squeeze her hand to respond "yes" and shake his head to respond "no." However, by the time he was moved out of long-term care, "he was a vegetable."

On cross-examination by counsel for Appellant Hopkins, Washington acknowledged that she knew the victim had a staph infection on his knee prior to July 25 but said that she did not know he had been diagnosed with a zygomatic fracture of his cheekbone, dizziness, and chronic kidney disease. She acknowledged that while the victim was in the hospital, he tried to sit up and stand up.

On cross-examination by counsel for Appellant Terrell, Washington testified that she did not know the victim had broken his cheekbone one month before this incident. She acknowledged that while the victim was in the hospital, he seemed to improve for a while but then "took a turn for the worse."

Eighteen-year-old Robert Armstrong testified that on July 25, 2012, he turned fifteen years old. Appellant Terrell was nineteen years old, and Appellants Hopkins and Buford were eighteen. Armstrong was "real close" with Appellant Terrell, and Appellants Terrell and Buford were good friends.

Armstrong testified that a couple of weeks before the victim was attacked, Armstrong overheard Terrell Vaughn tell Appellant Terrell that the victim was going to receive "a double check." On July 25, Armstrong and the Appellants were together "drinking, swimming, [and] playing basketball," and Appellant Terrell mentioned the victim's check. The four of them developed a plan to rob the victim of cash and "anything else of value." Armstrong and Appellant Hopkins were to stand just inside the doorway of the victim's apartment while Appellants Terrell and Buford went into the apartment and hit the victim with their fists. Armstrong and Appellant Hopkins were to go inside when they heard noises.

Armstrong testified that the four of them went to the victim's apartment and that he and Appellant Hopkins stood at the front door until they heard heavy objects being moved. They "assumed that it was a body" and entered the apartment. The victim was lying on the living room floor, was awake, and was saying, "[H]elp." The victim did not appear to have any injuries, and Armstrong went into the victim's bedroom. Armstrong "started looking around for stuff, started raising up mattresses, going inside shelves, just anything" and found two cellular telephones.

Armstrong testified that Appellant Buford beat the victim's face with his fists "[a]bout eight times" and that the victim "went unconscious." Appellant Terrell said, "Go in his pockets and get the money." Appellant Buford "[got] off" the victim, and Appellant Hopkins took the victim's wallet out of the victim's pocket and removed $140. Appellant Hopkins then dragged the unconscious victim from the living room into the bathroom, and Armstrong saw a lot of blood coming out of the victim's mouth. The State asked if Armstrong was concerned about the victim at that time, and Armstrong said no because "I was trying to get out of there." Appellant Hopkins tied up the victim with neckties, and the four of them left. They took the two telephones, the money, some keys, a few t-shirts, some oatmeal cream pies, and some juice. The items were in Appellant Terrell's backpack. Each of them received twenty dollars, and they spent the rest of the money on marijuana.

Armstrong testified that after the incident, they went to the Citgo gas station where they encountered Jerrico Ware and Terrell Vaughn. Armstrong saw Appellants Buford and Terrell talking with Ware and Vaughn but did not hear their conversation. Armstrong later saw a photograph of Ware and Vaughn on the television news. He said that his sisters urged him to turn himself in to the police rather than let Ware and Vaughn

"go down for something ya'll did." Therefore, Armstrong went to the police department and spoke with Sergeant Shafer. Armstrong was arrested and initially charged in juvenile court with kidnapping and robbery. He said he "pled guilty" and was later charged in adult court with murder. Armstrong signed an agreement with the State to testify against the Appellants in exchange for a guilty plea to facilitation of first degree felony murder committed during the perpetration of aggravated robbery and a sentence of thirteen and one-half years. A few days before trial, Armstrong received a letter from Appellant Terrell, asking Armstrong not to testify. Armstrong said the letter made him "uncertain" about testifying against the Appellants because he had a close relationship with Appellant Terrell and looked up to him.

On cross-examination by counsel for Appellant Buford, Armstrong testified that he did not know the victim prior to July 25 but had seen the victim in the park. Armstrong played basketball in the park every day but did not see the victim there often. The victim never approached Armstrong or conversed with him. Armstrong said he had been in the victim's apartment building prior to July 25 to visit Appellant Terrell's cousin, who lived on the third floor. Armstrong usually went to the third floor apartment with Appellant Terrell and someone named "Ashton." Counsel for Appellant Buford showed Armstrong a photograph of three males entering the victim's apartment building on July 21, 2012, and Armstrong identified the three males as himself, Terrell Vaughn, and Jerrico Ware. He said he did not know why they were in the building that day.

Armstrong testified that about 2:00 p.m. on July 25, the victim called Appellant Terrell's cellular telephone. Appellant Terrell was playing basketball, so Armstrong answered the phone. Armstrong did not recognize the victim's voice, but the victim's name appeared "in caller ID." Armstrong told Appellant Terrell that the victim had called and handed the telephone to Appellant Terrell. That evening, Armstrong and the Appellants went to Appellant Buford's house. Appellant Terrell mentioned the victim's disability check, and they developed the plan to rob the victim. They went to the back door of the victim's apartment building and "just walked in." Appellant Terrell knew where the victim lived, so they took the elevator to the seventh floor. Armstrong said he went to the victim's apartment willingly and knowing that the victim was going "to get beat up and robbed." He acknowledged that in order to get his "sweetheart deal" with the State, he had to testify against the Appellants and that he discussed his testimony with the State. The State told him that it would cancel the deal if he did not testify truthfully.

On cross-examination by counsel for Appellant Hopkins, Armstrong acknowledged that his plea agreement included being eligible for parole after serving twenty percent of his sentence and that he already was eligible for parole. He said that he was hoping to be released from prison after the Appellants' trial but that "I doubt it." He acknowledged that in his statement to Sergeant Shafer, he did not say Appellant Hopkins

tied up the victim. He also acknowledged telling Sergeant Shafer that Appellant Hopkins did not touch anyone during the incident.

On cross-examination by counsel for Appellant Terrell, Armstrong testified that Terrell Vaughn was fourteen years old on July 25. Vaughn was "the one" who revealed the victim's apartment number and that the victim was going to receive a check. When Armstrong gave his statement to Sergeant Shafer, he told the truth but had been handcuffed to a chair for six hours and "was just trying to get out of there." He acknowledged that he did not tell Sergeant Shafer that any of the Appellants hit the victim. He also acknowledged that without the State's plea deal, he was facing fifty-one years in prison.

Donna Nelson, a special agent forensic scientist with the Tennessee Bureau of Investigation (TBI) testified as an expert in DNA analysis that she tested the swabs collected from the victim's apartment and compared them to DNA samples collected from the victim, the Appellants, and Robert Armstrong. Blood on the living room wall matched the victim's blood, and blood in the bathroom partially matched the victim. Agent Nelson excluded the Appellants and Armstrong as contributors to the blood in the bathroom. Agent Nelson said that, based on the test results, she believed the victim bled in the living room and the bathroom.

On cross-examination by counsel for the Appellants, Agent Nelson acknowledged that she did not find the Appellants' DNA in the apartment. She did not receive DNA samples from Terrell Vaughn or Jerrico Ware for testing.

Erica Curry testified as an expert in forensic pathology that she performed the victim's autopsy. The victim's hospital records indicated that the following bones were broken in his face: his upper left jaw, both cheekbones, the bones "close to his jaw in the back," the bones surrounding his sinuses, his frontal and maxillary sinuses, his eye sockets, and his hard palette. The victim's fractures were caused by blunt force trauma. On July 31, 2012, surgeons "put plates and screws" in the victim's face to stabilize and align the bones for healing.

Dr. Curry testified that in addition to the fractures, the victim had bleeding behind his eyes, which caused his eyes to bulge, and bleeding in his sinuses. An MRI showed hemorrhaging on both sides of his brain, and the bleeding would have affected his brain's function. Physician notes stated that the victim suffered a "'traumatic brain injury.'" Dr. Curry said the notes indicated that the victim "was unconscious and he would go in and out of being alert and knowing his surroundings, to being unresponsive with not knowing where he was."

Dr. Curry testified that the victim had the following pre-existing conditions: Sarcoidosis; AIDS, not HIV; hypertension; chronic obstructive pulmonary disease; and chronic sinusitis. She explained that a person, such as the victim, with significant underlying disease would have more difficulty recovering from injuries than a healthy person. Tubes in a person's throat and stomach also "sets them up for infection," and a person with AIDS could not fight off infections like a normal person. After the victim's surgery on July 31, he developed bedsores and an infection in his eyes. He then developed sepsis, an infection in his blood. Dr. Curry explained that people with head trauma had an increased risk for seizures and that the victim had a seizure on September 29. He died on September 30. Dr. Curry said she determined that "his cause of death meaning the initiating event that led to his death was the blunt head trauma."

On cross-examination by counsel for Appellant Buford, Dr. Curry testified that she did not recall seeing in the victim's hospital records that he was diabetic. She said that she saw bedsores on his buttocks during the autopsy but that they "weren't that bad." She also saw scrapes on the victim's back, left ear, right shoulder, and right arm and multiple scars on his arms and legs. Discoloration of the victim's lungs indicated he probably smoked. Dr. Curry said the victim's toxicology tests were positive for Lorazepam, which was often used for sedation or to treat seizures, and morphine for pain.

On cross-examination by counsel for Appellant Hopkins, Dr. Curry acknowledged that the victim's heart was enlarged and that he suffered from chronic kidney disease and possibly diabetes. His medical records showed that he had a staph infection in June 2012. Regarding his pre-existing conditions, Dr. Curry stated that the victim "was not well" prior to July 25 and that the conditions "didn't make the injury that he received any better for him to heal from."

On cross-examination by Appellant Terrell, Dr. Curry testified that the victim did not have any skull fractures. He also did not have any bleeding of his brain at the time of the autopsy. His brain had some swelling but was normal otherwise. Dr. Curry acknowledged that the victim's hospital records listed twelve medical conditions at the time of his death and that "respiratory failure" was listed first while "history of traumatic brain injury" was listed twelfth. Dr. Curry said the list was insignificant to her regarding the victim's cause and manner of death. She explained:

So there is a such thing as the cause of death like I said which is the initiating chain of events and then there is a such thing as the proximate cause of death, meaning the thing that caused the death immediately. So what hospital clinicians tend to do is list all the diagnoses that they think caused the immediate cause of death. And so they just go through and they list everything. And then a lot of times they don't even list things in order

- 11 -

of importance. To them it's just a running list of what they can look at and document in the chart. So to me it doesn't have any significance.

On redirect examination, Dr. Curry testified that a normal, healthy person would have been able to recover from the victim's injuries. However, the victim's age and underlying medical conditions made his injuries more significant. Dr. Curry acknowledged that the victim would not have been in the hospital if he had not been beaten. At the conclusion of Dr. Curry's testimony, the State rested its case-in-chief.

Jerrico Ware testified for Appellant Terrell that he and Robert Armstrong were cousins. He said that he played basketball in the park almost every sunny day, that he did not know the victim, and that he had never seen the victim in the park. Ware said that he thought Terrell Vaughn knew the victim and that he went with Vaughn to the victim's apartment on the night of July 25 so that Vaughn could get money from the victim. Ware acknowledged that he was recorded on video in the victim's apartment building and that his shirt was covering his face. He said, though, that "I couldn't have been hiding my face because if that was the case, why [wasn't Vaughn] hiding his face. . . . I probably was wiping my face, anything, or laughing at him." Ware later saw Armstrong at the Citgo gas station. They spoke to each other, but they did not have a conversation.

On cross-examination by the State, Ware acknowledged that July 25 was Armstrong's birthday and said that he spent most of the day with Armstrong. That night, Ware and Terrell Vaughn went to the victim's apartment and knocked on the door. No one answered, so they left. Ware said he did not know if he and Vaughn went to the victim's apartment before or after the victim was attacked, that he did not know video cameras were in the building, and that he was not hiding his face with his shirt. When Ware and Vaughn saw Armstrong at the Citgo that night, the Appellants may have been with Armstrong. Ware denied that Armstrong said he had just robbed and beaten the victim or that Armstrong bragged about the robbery. Ware said Armstrong told him the next day that Armstrong and the Appellants had robbed the victim. Ware acknowledged telling Sergeant Shafer that the robbery occurred about 7:45 p.m. However, Ware told the jury that he did not know what time the robbery occurred. Although Ware had said on direct examination that he had never seen the victim in the park prior to July 25, he stated on cross-examination by counsel for Appellant Hopkins that he had seen the victim in the park.

On redirect examination, Ware testified that he did not remember telling Sergeant Shafer that he covered his face because he did not like cameras. He said he also did not remember telling Sergeant Shafer that he did not want to be seen going to the victim's apartment because the victim was "gay."

- 12 -

Seventeen-year-old Terrell Vaughn testified for Appellant Terrell that he was fourteen years old in July 2012 and that he used to play basketball in the park with the Appellants. He said the victim would sit on a bench at the basketball court, watching people play basketball. One day, the victim bought a drink for Vaughn, and Vaughn sat on the bench. Vaughn said that the victim offered to buy him a pair of shoes and that he thought the victim was trying to be "like a mentor or something." Vaughn stated that the victim invited him to the victim's apartment a few times and that the victim "came on to him" sexually in the apartment. One time on the basketball court, the victim tried to touch Vaughn's lower back while Vaughn's shirt was off. Vaughn said, "I knocked his hand out and I told him I don't get down like that." Vaughn acknowledged that he was mad at the victim for trying to touch him, that he wanted to "punch" the victim, and that he told Appellant Terrell about the victim's behavior. On July 25, 2012, Vaughn saw Robert Armstrong and the Appellants at the Citgo gas station, but Vaughn did not talk to Armstrong. He said he did not remember saying in his statement to police that Armstrong showed him a telephone that Armstrong had taken from the victim.

On cross-examination by the State, the State showed Vaughn his written statement to police, and he acknowledged signing it. He also acknowledged that he never said in his statement that the victim tried to touch him. However, he said in his statement that he told the Appellants he wanted to hit the victim but did not because the victim was "old." The State asked Vaughn various questions about what he said in his statement, and he repeatedly answered that he did not remember. Vaughn even told the jury, "I can't remember nothing I put in that statement." He acknowledged that he and Jerrico Ware went to the victim's apartment after he saw Armstrong and the Appellants at the Citgo but said, "I didn't want to go to [the victim's] house. Jerrico did." Vaughn and Ware entered the victim's apartment building through the back door and went up to the seventh floor. They knocked on the victim's door, and a neighbor saw them knocking. Nobody answered the door, so they left. Vaughn denied knowing that the victim had been beaten, stating, "If I knew he [had] been beat, I wouldn't have never went to his apartment." Vaughn later talked with the police because he saw himself on the television news.

On cross-examination by counsel for Appellant Hopkins, Vaughn acknowledged that he was handcuffed while he gave his statement. Counsel asked if he read through his statement thoroughly before he signed it, and Vaughn answered, "Not pretty much because they said that I wasn't going to get charged with it and they would let me go." He acknowledged that the victim tried to have a relationship with him and that the victim "promised [him] things." On cross-examination by Appellant Buford, Vaughn acknowledged that he thought the victim wanted sexual favors from him.

Romaris Partee testified for Appellant Terrell that he was Terrell Vaughn's cousin and played basketball with Vaughn. He said that he would see the victim in the park and

that he witnessed the victim try to touch Vaughn's back. Partee said that Vaughn "just moved his arm . . . and [was] shaking his head" and that Vaughn did not want the victim to touch him. Partee acknowledged that the victim's attempt to touch Vaughn appeared inappropriate.

On cross-examination by the State, Partee acknowledged that he and the Appellants were friends and that he looked up to them. He said that he did not think the Appellants were present when the victim tried to touch Vaughn but that Vaughn may have told them about it. Partee was nineteen years old at the time of trial but fifteen in July 2012.

Sergeant Jerry Chatman of the MPD testified on rebuttal for the State that he helped interview Terrell Vaughn on July 31, 2012. The State had him read Vaughn's statement to the jury as follows: Vaughn "figured out a couple [of] weeks ago" that the victim was "gay." The victim was "constantly making gay comments" to Vaughn, and Vaughn "was tired of his comments." Vaughn told Appellant Terrell about "how [the victim] tried [Vaughn]," and Appellant Terrell asked if the victim had some money. Vaughn told Appellant Terrell that the victim received checks every month. Vaughn last saw the victim at the end of June; the victim was walking across the park with his grandchildren. One day the week before Vaughn gave his statement, Vaughn was on the basketball court with Jerrico Ware, Appellant Terrell, and Robert Armstrong and told them that the victim was going to receive his check in a couple of days. Appellant Terrell, Ware, and Armstrong started "saying they was going to go beat" the victim. On July 25, Vaughn was with Ware and saw Appellant Terrell and Armstrong come out of Appellant Buford's house. About forty minutes later, Vaughn saw "them" at the Citgo, and "[t]hey" were all laughing. Vaughn asked what happened, and Appellant Terrell told Vaughn that he "just beat the old dude named Jessie" and took the victim's wallet. Appellant Terrell was carrying a backpack and asked if Vaughn wanted to buy something out of the backpack. Vaughn told him no. Vaughn "asked where they got that from and [Appellant Terrell] said they got it when they beat Jessie." Appellant Terrell showed the victim's wallet to Vaughn and said the victim was "beat real bad and bleeding out his mouth." Armstrong told Vaughn that he went through the victim's belongings and took the victim's cellular telephone. Armstrong showed the telephone to Vaughn.

Sergeant Chatman testified that after he took Vaughn's statement, he typed it out for Vaughn. He said that suspects and witnesses were shackled to a bench during interviews for officer safety but that they were offered food and water and allowed to go to the bathroom. He said he was "sure" Vaughn received those same opportunities.

On cross-examination by counsel for Appellant Buford, Sergeant Chatman testified that he did not know how long Vaughn was shackled to the bench prior to giving

his statement but that it was probably more than one hour. Vaughn spoke with the officers for at least another hour, and then Sergeant Chatman had to type Vaughn's statement.

On cross-examination by counsel for Appellant Hopkins, Sergeant Chatman testified that Vaughn was fourteen years old at the time of the interview and was not free to leave. Vaughn's mother gave permission for the interview, and a female family member was present during the interview. Sergeant Chatman said he did not know if the family member was a high school graduate of if she could read or write. Sergeant Chatman said Vaughn "seemed competent and aware of what was going on and aware of what he was doing and why he came down." Sergeant Chatman acknowledged that Vaughn appeared to be of average intelligence for his age and that Vaughn signed the statement after Sergeant Chatman read it to him.

At the conclusion of Sergeant Chatman's testimony, the jury convicted the Appellants as charged of first degree felony murder committed during the perpetration of or the attempt to perpetrate robbery in count one; first degree felony murder committed during the perpetration of or the attempt to perpetrate kidnapping in count two; aggravated robbery, a Class B felony, in count three; and especially aggravated kidnapping, a Class A felony, in count four. The trial court immediately sentenced the Appellants to life for the murder convictions. After a sentencing hearing, the trial court merged the murder convictions and sentenced Appellant Buford to concurrent sentences of twelve years for aggravated robbery and fifteen years for especially aggravated kidnapping and Appellants Terrell and Hopkins to concurrent sentences of eight years for aggravated robbery and fifteen years for especially aggravated kidnapping.

## II. Analysis

### A. Jury Instructions

1. "Killing" in First Degree Felony Murder Instruction

The Appellants contend that the trial court erred by deleting the word "killing" from portions of the jury instructions for first degree felony murder and that the error lowered the State's burden of proof. The State argues that the trial court properly instructed the jury. We agree with the State.

During a recess in the trial, the trial court advised the parties that, due to the victim's "delayed death," it was going to include a cause-of-death instruction in the final charge. Later, as the parties and the trial court were reviewing the final written instructions, counsel for Appellant Terrell noted that the written instructions for first

degree felony murder varied from the pattern instruction and requested that the trial court give the pattern instruction. However, the trial court refused, explaining that the pattern instruction "doesn't really make a lot of sense in a situation where the person lingers" and that "to make the causation instruction make sense, you've got to modify that to the actus reus. Otherwise you've got two conflicting causations problems here."

During the final jury charge, the trial court gave an instruction on first degree felony murder that closely tracked Tennessee Pattern Jury Instruction 7.03 for first degree felony murder. However, the trial court replaced the word "killing" in portions of the pattern instruction with "act or acts causing the death of the victim," which we have bolded:

> For you to find a defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements: One, that the defendant, or one for whom the defendant is criminally responsible, unlawfully killed Jessie Wilson; and two, that the **act or acts causing the death of the victim** was committed in the perpetration of or the attempt to perpetrate the alleged robbery [or kidnapping]; that is, that the **act causing the death of the victim** was closely connected to the alleged robbery [or kidnapping] and was not a separate, distinct, and independent event; and three, that the defendant intended to commit the alleged robbery [or kidnapping].
>
> . . . .
>
> The intent to commit the underlying felony of robbery [or kidnapping] must exist prior to or concurrent with the commission of the act or acts causing the death of the victim. Proof that such intent to commit the underlying felony existed before, or concurrent with, the **act or acts causing the death of the victim** is a question of fact to be decided by the jury after consideration of all the facts and circumstances.
>
> Consideration of such factors as time, place and causation is helpful in determining whether the **act or acts causing the death of the victim** was committed in the perpetration of the alleged robbery [or kidnapping]. The **act or acts causing the death of the victim** may precede, coincide with, or follow the robbery [or kidnapping] and still be considered as occurring in the perpetration of the robbery [or kidnapping], so long as there is a connection in time, place and continuity of action.

See T.P.I. - Crim. 7.03. The Appellants contend that by changing the word "killing" to "act or acts causing the death of the victim," the trial court "signaled to the jury that it could find the Appellants guilty if the jury believed that the Appellants' assault of the victim could in any way be linked tangentially to [the victim's] death."

"It is well settled that a defendant has a constitutional right to a complete and correct charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Dorantes, 331 S.W.3d 370, 390 (Tenn. 2011). We have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). Generally, a charge "is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). "In order to determine whether a conviction should be reversed on the basis of an erroneous instruction to the jury, this Court must consider whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (citations omitted). "An instruction should be considered prejudicially erroneous only if the jury charge, when read as a whole, fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Faulkner, 154 S.W.3d 48, 58 (Tenn. 2005).

Initially, we note that pattern jury instructions are "only suggestions for a trial court" and "not entitled to any particular deference on review." State v. Rimmer, 250 S.W.3d 12, 30 (Tenn. 2008). In any event, the trial court did not always replace the word "killing" in the pattern instruction with "act or acts causing the death of the victim." For example, the trial court advised the jury that the first element of first degree felony murder was that the Appellants unlawfully "killed" the victim. Later in the first degree felony murder instructions, the trial court instructed the jury that "[w]hen one enters into a scheme with another to commit a robbery [or kidnapping] and death ensues, all defendants entering into the scheme are responsible for the death regardless of who actually committed the killing and whether the killing was specifically contemplated by the other." See T.P.I. - Crim. 7.03 (stating same).

Moreover, the trial court gave the following cause-of-death instruction, which closely tracked the cause-of-death pattern instruction:

Before the defendant can be convicted of any degree of homicide, the State must have proven beyond a reasonable doubt that the death of the deceased was proximately caused by the criminal conduct of the defendant, by the conduct of another for whom the defendant is criminally responsible, or both. The proximate cause of a death is that cause which, in natural and

- 17 -

continuous sequence, unbroken by any independent intervening cause, produces the death and without which the death would not have occurred.

The defendant's conduct, or the conduct of one for whom the defendant is criminally responsible, need not be the sole or immediate cause of death. The acts or omissions of two or more persons may work concurrently to proximately cause the death, and in such a case, each of the participating acts or omissions is regarded as a proximate cause. It is not a defense that the negligent conduct of the deceased may also have been a proximate cause of the death.

However, it is a defense to homicide if the proof shows that the death was caused by an independent intervening act or omission of the deceased or another which the defendant, in the exercise of ordinary care, could not reasonably have anticipated as likely to happen.

However, if, in the exercise of ordinary care, the defendant should reasonably have anticipated the intervening cause, that cause does not supersede the defendant's original conduct, and the defendant's conduct is considered the proximate cause of death. It is not necessary that the sequence of events or the particular injury be foreseeable. It is only necessary that the death fall within the general field of danger which the defendant should have reasonably anticipated.

. . . .

If some other circumstance caused the victim's death, unrelated to the defendant's actions, that would be a defense to homicide unless the circumstance was the natural result of the defendant's act.

If there is evidence in this case that the deceased required medical attention as a result of injuries that may have been unlawfully inflicted by the defendant, or one for whom the defendant is criminally responsible, and if you find that such treatment itself may have contributed to the death of the deceased, then you must determine whether the [medical] treatment is of such a character as to relieve the defendant of the responsibility for the death.

One who unlawfully and seriously injures another to the extent that medical attention is required bears the risk that improper treatment may result in the death of the injured person. If the defendant, or one for whom

the defendant is criminally responsible, unlawfully and seriously injured the deceased, he is not relieved of responsibility unless the treatment was performed in a grossly negligent and unskillful manner and unless it was the sole cause of the death.

If you find that the defendant's acts or the acts of a person for whom the defendant is criminally responsible, or the acts of both, if any, did not unlawfully cause or contribute to the death of the deceased, or if you have a reasonable doubt as to this proposition, then you must find him not guilty.

See T.P.I. - Crim. 42.14.

The cause-of-death instruction was extensive and specifically advised the jury that in order to find the Appellants guilty of first degree felony murder, the State must have proven beyond a reasonable doubt that they proximately caused the victim's death. Therefore, given the jury charge as a whole, we conclude that the jury instructions for first degree felony murder did not mislead the jury as to the applicable law and did not lower the State's burden of proof.

2.  Failure to Instruct on Underlying Felonies for First Degree Felony Murder

Appellant Buford also contends that the trial court erred by failing to list the elements for the underlying felonies, i.e., robbery and kidnapping, when it was instructing the jury on counts one and two of first degree felony murder. The State argues that Appellant Buford has waived this issue because he failed to object at trial and that he is not entitled to plain error relief. We agree with the State.

The Appellant failed to object to the jury instructions regarding this issue. See Tenn. R. App. P. 36(a). Nevertheless, we can review the issue for plain error. Tenn. R. App. P. 36(b); State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015).

The Appellant does not contend that the instructions for first degree felony murder were incorrect but contends that the instructions were incomplete because the trial court did not list the elements for the underlying offenses of robbery and kidnapping "until pages 18 and 26 of the written jury instructions." The pattern jury instruction for first degree felony murder provides that the trial court is to state the elements of the underlying felony. See T.P.I. - Crim. 7.03. However, instead of providing the elements of robbery and kidnapping in the first degree felony murder instructions, the trial court stated that the "essential elements necessary to constitute robbery [and kidnapping] will be defined below." The trial court did not instruct the jury on the elements of robbery

and kidnapping until it instructed the jury on the lesser-included offenses of aggravated robbery in count three and especially aggravated kidnapping in count four.

Although the better practice would have been for the trial court to list the elements of the underlying felonies in the first degree felony murder instructions, the trial court advised the jury that it would define the elements of the underlying felonies "below" and eventually did so. Thus, we cannot say that a clear and unequivocal rule of law was breached or that a substantial right of the accused was adversely affected. State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994); see Tenn. R. App. P. 36(b). Accordingly, the Appellant is not entitled to plain error relief.

3. Facilitation Instruction

Appellant Buford contends that the trial court erred by failing to instruct the jury on facilitation as a lesser-included offense of first degree felony murder because the jury demonstrated that it was "willing to consider rendering a verdict for something less than felony murder but a greater charge than second degree murder." He also contends, without any explanation, that the trial court erred by failing to instruct the jury on facilitation of aggravated robbery as a lesser-included offense of aggravated robbery and facilitation of especially aggravated kidnapping as a lesser-included offense of especially aggravated kidnapping. The State argues that the Appellant has waived these issues because he failed to request any instruction on facilitation and that he is not entitled to plain error relief. We agree with the State.

After Appellant Terrell presented his witnesses, the trial court allowed the parties to examine the prospective written jury instructions and suggest changes. Counsel for Appellant Terrell noticed that the instructions included only second degree murder as a lesser-included offense of first degree felony murder and requested that the trial court also instruct the jury on voluntary manslaughter and reckless homicide. The trial court refused and instructed the jury only on second degree murder as a lesser-included offense.

During deliberations, the jury sent out a written note, asking two questions: (1) "Is there an option for 2nd degree murder in the perpetration of or attempt to perpetrate robbery?" and (2) "Is there an option for 2nd degree murder in the perpetration of or attempt to perpetrate kidnapping?" The trial court asked how the parties thought the court should answer the questions, and the State suggested that the court refer the jurors to the page in the instructions that explained the order of their deliberations. Counsel for Appellants Buford and Hopkins agreed with the State. Counsel for Appellant Terrell suggested that the court tell the jury that "there is no second degree murder in the perpetration of [a] felony in Tennessee" and then remind the jury about "the order of

consideration." The trial court had the jury brought into the courtroom and stated, "The answer [to your questions] is no." The court then instructed the jury to consider the offense of felony murder first and, if it found the Appellants not guilty of that offense, consider his guilt for the lesser-included offense of second degree murder. The jury resumed deliberations and returned guilty verdicts on first degree felony murder.

As noted by the State, none of the Appellants made oral or written requests for instructions on facilitation. Tennessee Code Annotated section 40-18-110(c) provides that when a defendant fails to make a written request for a lesser-included offense instruction, the issue is waived and may not be presented as a ground for relief in a motion for new trial or on appeal. See also State v. Martin, 505 S.W.3d 492, 503 & n.8 (Tenn. 2016). Thus, the issue has been waived. That said, we may review the failure to give a lesser-included offense instruction for plain error. State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006).

Relevant to this case, first degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery [or] . . . kidnapping. Tenn. Code Ann. § 39-13-202(a)(2). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). "In other words, a person guilty of facilitation has supplied substantial assistance to the principal without the intent to promote, assist in, or benefit from the crime." State v. Alex Goodwin, No. W2015-00813-CCA-R3-CD(C), 2017 WL 2472371, at *12 (Tenn. Crim. App. at Jackson, June 7, 2017) (citing State v. Fowler, 23 S.W.3d 285, 287 (Tenn. 2000)), perm. app. denied, (Tenn. Oct. 6, 2017). Facilitation of first degree felony murder is a lesser-included offense of first degree felony murder. Tenn. Code Ann. § 40-18-110(f)(2). However, an instruction on a lesser-included offense is not warranted unless

> the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

Tenn. Code Ann. § 40-18-110(a). When a defendant claims that the trial court committed plain error by failing to give a lesser-included offense instruction, "the defendant must show a reasonable probability that 'a reasonable jury would have convicted the defendant

of the lesser-included offense instead of the charged offense.'" State v. Martin, 505 S.W.3d 492, 505 (Tenn. 2016) (quoting State v. Richmond, 90 S.W.3d 648, 662 (Tenn. 2002)).

Appellant Buford contends that a facilitation instruction was necessary because the evidence "suggests that it was [Appellant] Terrell who suggested and planned the aggravated robbery." However, even so, video shows Appellant Buford going to the victim's apartment with his codefendants. Armstrong testified that Appellant Buford hit the victim's face repeatedly with his fists, rendering the victim unconscious; that Appellant Hopkins took $140 out of the victim's wallet; and that Appellant Hopkins dragged the victim from the living room to the bathroom and bound him with neckties. Appellant Buford told Sergeant Shafer that $141 was taken from the victim, that he searched the living room for "more money," and that he took juice and oatmeal pies. He also stated that he saw the victim lying on the bathroom floor and that he never sought help for the victim. In sum, the evidence shows that Appellant Buford was an active participant in the beating, robbery, and kidnapping of the victim and that facilitation instructions were not necessary. Therefore, he has failed to show that a clear and unequivocal rule of law was breached or that one of his substantial rights was adversely affected. See State v. Abraham Medina, Jr., No. W2014-02358-CCA-R3-CD, 2015 WL 6122265, at *6 (Tenn. Crim. App. at Jackson, Oct. 16, 2015), perm. to app. denied, (Tenn. Feb. 19, 2016). Accordingly, he is not entitled to plain error relief. Adkisson, 899 S.W.2d at 641-42; see Tenn. R. App. P. 36(b).

## B. Prosecutorial Misconduct

The Appellants claim that the trial court erred by allowing the State to engage in prosecutorial misconduct during jury voir dire and closing arguments. The State contends that the trial court did not err. We conclude that the Appellants are not entitled to relief.

In order to prevail on a claim of prosecutorial misconduct, the Appellants must demonstrate that the conduct committed by the prosecution was so inflammatory or improper that it affected the verdict to his detriment. Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); State v. Gray, 960 S.W.2d 598, 609 (Tenn. Crim. App. 1997). In making this determination, this court is guided by five factors:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984). We note that "the Judge factors should only be applied to claims of improper prosecutorial argument," as in this case, not claims of unconstitutional prosecutorial comment. State v. Jackson, 444 S.W.3d 554, 591 n.50 (Tenn. 2014). "[T]he State bears the burden of proving unconstitutional prosecutorial comment or argument harmless beyond a reasonable doubt, whereas a defendant bears the burden of proving prejudice when prosecutorial argument is merely improper." Id.

Regarding prosecutorial misconduct during closing arguments, it is well-established that closing argument is an important tool for both parties during a trial; thus, counsel is generally given wide latitude during closing argument, and the trial court is granted wide discretion in controlling closing arguments. See State v. Carruthers, 35 S.W.3d 516, 577-78 (Tenn. 2000) (appendix). "Notwithstanding such, arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Goltz, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003).

In Goltz, 111 S.W.3d at 6, this court outlined "five general areas of prosecutorial misconduct" that can occur during closing argument: (1) intentionally misleading or misstating the evidence; (2) expressing a personal belief or opinion as to the truth or falsity of the evidence or defendant's guilt; (3) making statements calculated to inflame the passions or prejudices of the jury; (4) injecting broader issues than the guilt or innocence of the accused; and (5) intentionally referring to or arguing facts outside the record that are not matters of common public knowledge. "In determining whether statements made in closing argument constitute reversible error, it is necessary to determine whether the statements were improper and, if so, whether the impropriety affected the verdict." State v. Pulliam, 950 S.W.2d 360, 367 (Tenn. Crim. App. 1996).

First, the Appellants take issue with statements made by one of the prosecutors during jury voir dire. During the State's questioning of the potential jurors, the prosecutor said that he was going to give them "a hypothetical." He then stated as follows:

- 23 -

[Counsel for Appellant Terrell] decides he's going to kidnap -- he's going to kidnap [a female potential juror]. He knows [she] has a lot of family money, right, she's a rich woman. He knows all about her and he's followed her for a couple weeks, knows her patterns.

She leaves work, leaves work from the back door and it's usually late and no one will be around. He develops this plan.

At that point, counsel for Appellant Terrell objected "to hypotheticals about me kidnapping members of the jury." The trial court stated, "All right. I'll give you some freedom but I'll also allow you to do your hypotheticals too." The prosecutor stated that he did not want to offend counsel and continued with his hypothetical but used a potential juror as the kidnapper.

We think the prosecutor's referring to counsel as a kidnapper was, at best, in poor taste. However, counsel objected to the prosecutor's statements. The prosecutor said that he did not want to offend counsel and immediately changed the name of the kidnapper. Therefore, we do not think the prosecutor's statements prejudiced the Appellants.

Next, the Appellants contend that the second prosecutor attempted to bolster the State's case by saying during the State's initial closing argument, "I think the State has proven their case beyond a reasonable doubt." Counsel for Appellant Terrell objected to the prosecutor's "expression of a personal opinion," and the trial court stated that "you can change it to I submit." The prosecutor then stated, "The State submits that there's enough evidence to prove beyond a reasonable doubt that [the Appellants] are guilty." As this court has stated previously, "A prosecutor's use of the phrases 'I think,' or 'I submit' does not always indicate a prosecutor's personal opinion." State v. Dwight Gossett, No. W2013-01120-CCA-R3-CD, 2014 WL 6609353, at *15 (Tenn. Crim. App. at Jackson, Nov. 21, 2014). In our view, the prosecutor was not attempting to convey his personal belief but was commenting on the strength of the State's case. Therefore, we do not think his statement was improper.

The Appellants next claim that the second prosecutor personally attacked their counsel, accused their counsel of "intentional trickery," and tried to inflame the jury when he stated as follows:

[Counsel for Appellant Terrell] during his opening said Jessie Wilson was a sick man. Well what 61 year old doesn't have some type of health issues, okay? The State is not arguing with that. Jessie did have some health issues. But Jessie Wilson would have never been in that

- 24 -

hospital if they didn't do what they did to him.  And I think the bottom line and y'all have to remember this is that's why Jessie was in the hospital.

Don't get fooled.  Don't buy their argument.  Just keep that in mind when you're back there.

. . . .

Now another thing that's come out during this trial is that, you know, the victim is -- pedophilia.  I think [counsel for Appellant Terrell] said that at the beginning, that he was into young, hot sweaty young boys.  That's what he said.  There's been some proof of that in their case they put on.  The State is not asking you to find that Jessie Wilson was a man of great character.  The State is not asking you to find that Jessie Wilson was a good person or bad person.

You know, what do you do when the law and the facts are not on your side?  What do you do when you don't have much to argue?  You bash the victim.  You bash his character, say the victim was a bad person, say the victim was an evil person.  You focus on the victim and his bad qualities.

And I anticipate they're about to get up here and talk about that.  But when I sit down, you need to remember this isn't the trial to bash Jessie Wilson's character, okay.  You do that when you don't have much to argue, when the law and the facts aren't on your side.  Bash the victim, throw the victim under the bus, make you hate the victim.  But just remember the evidence about July 25, 2012, remember.

Counsel for Appellant Terrell objected to "the inappropriate comments about opposing counsel trying to make you hate the victim."

The prosecutor's statements criticizing the tactics of defense counsel were improper.  "The prosecution is not permitted to reflect unfavorably upon defense counsel or the trial tactics employed during the course of the trial."  State v. Garner Dwight Padgett, No. M2003-00542-CCA-R3-CD, 2004 WL 2359849, at *12 (Tenn. Crim. App. at Nashville, Oct. 21, 2004).

Nevertheless, applying the Judge factors, we conclude that the prosecutor's comments did not affect the verdicts.  See Tenn. R. Crim. P. 36(b).  First, we consider the improper statements in context of the case as a whole.  The Appellants' theory of the case was that the victim was a pedophile who was having a sexual relationship with Robert

- 25 -

Armstrong and who had propositioned Terrell Vaughn for sex; therefore, Armstrong and Vaughn had a motive to physically harm the victim. During opening statements, counsel for Appellant Terrell told the jury that the victim "probably . . . suffered from what we call pedophilia." However, the proof never showed that the victim was having a sexual relationship with Armstrong or that the victim's conduct toward Vaughn had anything to do with the crimes. Even Vaughn, who testified for Appellant Terrell that the victim tried to touch his bare back and propositioned him, never suggested that the crimes were related to the victim's conduct toward him. Therefore, we believe the prosecutor's comments were prompted by the Appellants' accusing the victim of being a pedophile and introducing evidence during the trial that ended up having little, if any, relevance to the crimes. Regarding the second factor, curative measures, defense counsel objected to the prosecutor's statements, but the trial court did not issue a specific ruling on the objection or immediately provide a curative instruction. At the conclusion of closing arguments, though, the trial court instructed the jury to base its verdicts on the evidence, not the statements of counsel. Generally, we presume that a jury has followed the trial court's instructions. See State v. Butler, 880 S.W.2d 395, 399 (Tenn. Crim. App. 1994). Regarding the third factor, the prosecutor's intent, we cannot say that the prosecutor acted in bad faith. Fourth, regarding the cumulative effect of the error, as we will explain below, we also conclude that the trial court erred by failing to give the jury a limiting instruction pursuant to Bruton. However, the evidence in this case was overwhelming. Therefore, we conclude that the Bruton error, combined with the improper argument, does not warrant reversal.

The Appellants also take issue with the following statements made by the first prosecutor during his rebuttal closing argument:

> They have taken tremendous liberties with the proof. Why do they want to deceive you? The facts are not in their favor. The law is not in their favor. Let's make Jessie Wilson look like an evil person. Even if he is an evil person, right, well let's prosecute him. If Jessie Wilson is so awful, let's prosecute him for what he's done wrong. You don't take him out back and [beat] the hell out of him, beat his face to a pulp.
>
> They get the privilege of a trial. They don't get the death penalty. Jessie Wilson did --

Counsel for all three of the Appellants interrupted the prosecutor and objected. The trial court stated that it thought the prosecutor was "essentially trying to say the victim didn't get a trial, he got executed. And I think he's just doing it in a dramatic fashion." The trial court overruled the objections.

- 26 -

The Appellants contend that the prosecutor's speaking about the death penalty was "clearly improper," "furthered the State's pattern of systematically attempting to engender hatred" toward defense counsel, and was designed to inflame the passions of the jury. However, we believe the prosecutor made the remarks in response to counsel for Terrell Vaughn stating in his closing argument that Vaughn went to the victim's apartment after the Appellants and "[took] justice into his own hands." Therefore, we agree with the trial court that the prosecutor's statement, while dramatic, was not improper. In any event, given the proof, we do not believe the prosecutor's argument affected the verdict. See Tenn. R. App. P. 36(b).

Finally, the Appellants contend that the following statements made by the first prosecutor during his rebuttal closing also were improper.

> [Counsel for Appellant Terrell] asked [Dr. Curry] lots and lots of questions about medical errors, medical errors, medical errors. He never -- he never actually pointed out one. He never got Dr. Curry to point out that there was any problem with the [victim's] treatment.

After the prosecutor finished his rebuttal closing, counsel for Appellant Terrell objected, arguing that the prosecutor gave a "burden-shifting argument." The trial court noted that counsel should have objected contemporaneously but said that it would give a curative instruction. The court instructed the jury that it was "to base your decision in this courtroom on the evidence that you heard from the witness stand, not from anything that the lawyers say in this courtroom."

The Appellants claim that the prosecutor's argument shifted the burden of proof by insinuating that they had to prove an intervening cause of death for the victim in order for the jury to find them not guilty of first degree felony murder. We disagree. During closing argument by counsel for Appellant Terrell, he argued that a medical procedure in the hospital could have caused the victim's death. Therefore, we believe the prosecutor was responding to counsel's argument. Moreover, the cause-of-death instruction advised the jury on how it was to consider the victim's medical treatment and that it was the State's burden to prove beyond a reasonable doubt that the Appellants' conduct was the proximate cause of the victim's death. Thus, we conclude that the Appellants are not entitled to relief.

## C. Codefendants' Statements

Appellant Buford contends that the trial court erred by refusing to sever his trial from that of Appellants Hopkins and Terrell and that severance was warranted by the State's use of his and Appellant Terrell's written confessions in violation of Bruton v.

United States, 391 U.S. 123 (1968). In a related argument, Appellants Hopkins and Terrell contend that the trial court erred by allowing Sergeant Shafter to testify about the two confessions in violation of Bruton. Moreover, all three of the Appellants argue that the trial court erred by failing to give a limiting instruction as required by Bruton. The State argues that the trial court did not err by denying the severance motions and admitting the confessions because the trial court properly redacted the Appellants' statements. We conclude that the trial court erred by failing to give a limiting instruction but that the error was harmless.

Before trial, Appellant Buford filed two motions to sever his trial. During a hearing on the motions on the first morning of trial, counsel for Appellants Hopkins and Terrell stated that they opposed the motions to sever but that the trial court should prohibit the State from admitting the confessions of Appellants Buford and Terrell into evidence pursuant to Bruton. The State said that it did not intend to introduce any written confessions into evidence but that it had redacted the confessions and intended to question Sergeant Shafer about them. Defense counsel argued that redacting the confessions was insufficient to cure the Bruton problem because the redacted confessions still implicitly incriminated codefendants. The State gave copies of the redacted confessions to the trial court and advised the court that it had removed all references to codefendants. The court reviewed the redacted confessions with the parties and ordered further redaction. The trial court denied Appellant Buford's motion to sever and ruled that the State could question Sergeant Shafer about the redacted confessions as modified.

On direct examination, Sergeant Shafer testified as follows regarding the confessions of Appellants Buford and Terrell:

Q      Did Mr. Buford incriminate himself with regard to Jessie Wilson?

A      Yes, sir.

Q      In his statement did he give you indication of what he did himself?

A      He did.

. . . .

Q      Did you ask him this question: In your own words describe what occurred, before, during, and after this incident. Were you a suspect?

A      Yes.

- 28 -

Q      And can you see there what his response was about what he did?

A      Yes.

Q      What did he tell you?

A      I was searching the front room near the couch for more money. I went into the refrigerator and got some juice and oatmeal pies.

Q      Now the next question down. Did you ask him this question: After Jessie was initially assaulted, what did he say, if anything?

A      Yes.

Q      What was his response?

A      He wasn't saying anything but it sounded like he was snoring.

Q      Did you ask him this question: Were you at all concerned for Jessie at this point?

A      Yes, I did ask him that.

. . . .

Q      What was his answer?

A      No, sir. I was just trying to get out and leave.

Q      Did you ask him this question: Exactly how much money and what other property was taken from Jessie?

A      Yes, sir.

Q      What was Mr. Buford's answer?

A      $141 and some food.

Q      Did you ask him this question: Describe the injuries you observed Jessie to have?

- 29 -

A      Yes, I did.

Q      What was his answer?

A      He only had a couple of knots on his face.

Q      Did you ask him the question:  Was he speaking after he was assaulted?

A      I did ask him that.

Q      What did he say?

A      No, sir.

Q      Did you ask him this question:  Was Jessie able to defend himself once he was assaulted?

A      I did ask him that.

Q      What was Ashton Buford's response?

A      No, sir.

Q      Did you ask him was Jessie bleeding from this assault?

A      I did.

Q      His answer?

A      No, when I saw him.

Q      Did you ask him:  Was Jessie standing or lying on the floor in the bathroom?

A      I did.

Q      His answer?

A      Lying.

Q	Did you ask him the question: At any point did you attempt to seek medical treatment for Jessie?

A	I did ask him.

Q	His answer?

A	No, sir.

Q	Did you know Jessie prior to this incident?

A	I did ask him that.

Q	And his answer?

A	No, sir.

. . . .

Q	Did [Devante Terrell] incriminate himself in this incident involving Jessie Wilson?

A	He did.

Q	And let me ask you if you could turn to page 2. Did you ask this question of him: . . . . In your own words, describe what occurred before, during, and after this incident where you're a suspect.

A	I did.

Q	And his response the next line down there?

A	Terrell [Vaughn] told that Jessie was supposed to get some money.

. . . .

Q	What did he tell you next?

A	I called [Jessie].

. . . .

- 31 -

Q      What did he tell you next?

A      Jessie thought I was Terrell [Vaughn]. I said I will be over there about seven or eight. I knocked on the door. I shut the door. I told Robert [Armstrong] to give me some juices.

Q      Did you ask him the question: After Jessie was initially assaulted what did he say, if anything?

A      I did ask him that.

Q      What did he say Jessie did?

A      He was just yelling, quote, stop hitting me, what you hitting me for, end quote.

Q      Did you ask him to describe Jessie's injuries?

A      I did.

Q      What was Devante Terrell's response?

A      Blood out of his mouth.

Q      Did you ask him the question: When Jessie was on the living room floor was he saying anything?

A      I did ask him that.

Q      And what did Devante say?

A      No, just breathing hard.

Q      Question: Were you concerned for Jessie's well being? Did you ask him that?

A      I did.

Q      What did Devante tell you?

A       Yeah, because there was too much blood coming out of his mouth.

Q       Question: Did you seek medical treatment for Jessie?

. . . .

A       No.

Q       Did you ask him to name all the property obtained off Jessie and out of Jessie's apartment during this incident?

A       I did.

Q       What did he say he got?

A       I want to say money and a phone and then juices.

Q       Question: Did you ask him this question: How much money was taken from Jessie?

A       I did.

Q       And what was his response?

A       It was $140.

Q       And compared to Ashton Buford's response on that issue, how much money did Ashton Buford tell you he got?

A       It was 140 or 141.

Q       Now moving on down towards the bottom there, did you ask him this question: How much did you get -- exactly how did you get Jessie's property out of his apartment?

A       I did.

Q       Excuse me. And what was Devante's response?

A       It was in the backpack that I was carrying.

- 33 -

Q        Is that consistent with the video that you obtained in this incident?

A        Yes, sir.

Q        Did you ask him this question:  How did you get into Jessie's apartment?

A        I did.

Q        And the answer that he gave you about his participation?

A        As soon as he opened the door I just busted in on him.

Q        Did you ask him this question:  Did you force your way into Jessie's apartment after Jessie opened the door?

A        I did.

Q        His answer?

A        Yeah.

Q        Question:  What were you wearing during this incident?

A        I think I had -- I did ask him that question.

Q        And what was his answer?

A        I think I had gym shorts on that day and a backpack.

Q        Did you ask him the question:  Did you know Jessie prior to this incident?

A        I did.

Q        His answer?

A        No.

Q        Question:  Have you ever been inside Jessie's apartment prior to this incident?

- 34 -

A        I did ask him that.

Q        His response?

A        No.

Q        That's all the questions I have.

We review a trial court's determination regarding the severance of offenses for an abuse of discretion.  State v. Shirley, 6 S.W .3d 243, 247 (Tenn. 1999).  "A holding of abuse of discretion reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case."  State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999).

Tennessee Rule of Criminal Procedure 8(c)(1) permits joinder of defendants in the same indictment "if each of the defendants is charged with accountability for each offense included."  Tennessee Rule of Criminal Procedure 14(c)(1)(B) provides that "[i]f a defendant moves for a severance because an out-of-court statement of a codefendant makes reference to the defendant but is not admissible against the defendant," the prosecuting attorney may elect a joint trial "at which the statement is admitted in evidence only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant."

In Bruton, the United States Supreme Court held that allowing into evidence a codefendant's statement that implicated the defendant when the codefendant did not testify violated the defendant's right to confrontation.  391 U.S. at 126.  However, a Bruton violation can be avoided by redacting the codefendant's statement and by instructing the jurors that they can consider the codefendant's incriminating statement only as to that codefendant.  Richardson v. Marsh, 481 U.S. 200, 208 (1987).  Moreover, according to the Advisory Commission Comments for Tennessee Rule of Criminal Procedure 14, subdivision (c)(1) "deals with the Bruton issue [by] making severance unnecessary where no Bruton violation would follow, as would be true, for example, where the confessing codefendant testifies or where redaction eliminates any prejudice to the nonconfessing codefendant."  Tenn. R. Crim. P. 14, Advisory Comm'n Cmt.

Turning to the instant case, the trial court carefully reviewed the two written confessions with the parties and ordered that the State further redact the confessions so that they did not implicate codefendants.  For example, the trial court ordered that the statements "I could hear licks from the bedroom" and "I don't know exactly [how many times the victim was struck because] after the first two licks, I turned my head and started

- 35 -

searching" be redacted from Appellant Terrell's confession because they implicated the codefendants. As a result of the redactions, Appellant Buford's confession did not facially incriminate any of the Appellants but himself, and Appellant Terrell's statement did not facially incriminate any of the Appellants but himself. Bruton is limited to situations in which "the codefendant's confession 'expressly implicat[ed]' the defendant as his accomplice" and does not extend to situations in which "the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial." Richardson, 481 U.S. at 208 (quoting Bruton, 391 U.S. at 124 n.1); see State v. Octavius Flynn, No. W2015-01648-CCA-R3-CD, 2017 WL 1861784, at *17 (Tenn. Crim. App. at Jackson, May 5, 2017), perm. app. denied, (Tenn. Sept. 22, 2017). Therefore, we conclude that the trial court did not abuse its discretion by denying Appellant Buford's motion to sever and that the Appellants' confrontation rights were not violated.

We note, though, that the trial court did not instruct the jurors that they could consider Appellant Buford's confession only against Appellant Buford and Appellant Terrell's confession only against Appellant Terrell. The State argues that the Appellants have waived this issue because they failed to request a limiting instruction in writing and did not object to a draft of the written instructions when the trial court gave them an opportunity to review the written instructions before the trial court read them to the jury. However, the trial court stated during the trial that it was going to give a limiting instruction. The trial court failed to do so. Therefore, we do not agree that the issue has been waived. That said, a trial court's failure to give a limiting instruction may be harmless error. State v. Person, 781 S.W.2d 868, 873 (Tenn. 1989). Given the overwhelming evidence of the Appellants' guilt, which we will summarize in the section below, we conclude that the error was harmless.

D. Sufficiency of the Evidence

Appellant Buford claims that the evidence is insufficient to support his convictions of first degree felony murder because the evidence fails to show that the facts and circumstances of the underlying felonies were the proximate cause of the victim's death and his conviction of especially aggravated kidnapping because the State failed to show that the victim's removal or confinement exceeded that necessary to commit the aggravated robbery. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443

U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As stated previously, first degree felony murder in this case is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery [or] . . . kidnapping." Tenn. Code Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction . . . except the intent to commit the [underlying felony]." Tenn. Code Ann. § 39-13-202(b).

Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Kidnapping is defined as false imprisonment "under circumstances exposing the other person to substantial risk of bodily injury." Tenn. Code Ann. § 39-13-303(a). False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a). Kidnapping becomes especially aggravated kidnapping when the victim suffers serious bodily injury. Tenn. Code Ann. § 39-13-305(a)(4).

Taken in the light most favorable to the State, the evidence shows that Terrell Vaughn told Robert Armstrong and the Appellants that the victim was going to receive a

"double" disability check and that Armstrong and the Appellants formulated a plan to rob the victim. The plan included Armstrong and Appellant Hopkins waiting by the front door while Appellants Burford and Terrell entered the apartment and subdued the victim. On the night of July 25, 2012, the four of them went to the apartment, and Appellant Terrell knocked on the door. The victim, thinking Appellant Terrell was Terrell Vaughn, opened the door, and Appellant Terrell forced his way inside. Either Appellant Terrell, Appellant Buford, or both beat the victim in the living room. Armstrong and Appellant Hopkins entered the apartment and began looking for anything of value. Appellant Buford beat the victim with his fists, fracturing multiple bones in the victim's face and rendering the victim unconscious. Armstrong and the Appellants took the victim's money, cellular telephones, juice, and cream pies; put the items into Appellant Terrell's backpack; and left the apartment.

Appellant Buford contends that the evidence does not show that the beating was fatal and that the victim's pre-existing medical conditions caused his death, which occurred more than two months after the beating. However,

> [o]ne who unlawfully inflicts a dangerous wound upon another is held for the consequences flowing from such injury, whether the sequence be direct or through the operation of intermediate agencies dependent upon and arising out of the original cause. Odeneal v. State, 157 S.W. 419 (1913). To convict the defendant, it is not necessary that his act or failure to act be the sole cause, nor the most immediate cause of death. It is only necessary that the defendant unlawfully contributed to the death of the deceased. Letner v. State, 299 S.W. 1049 (1927).

State v. Roberson, 644 S.W.2d 696, 698 (Tenn. Crim. App. 1982).

Here, the evidence established the victim was able to walk, talk, run errands with his daughter, and walk his granddaughters to the park earlier on the day he was beaten by the Appellants. After the beating, though, he never regained full consciousness or the ability to speak. Dr. Curry stated that while the victim's age and pre-existing conditions exacerbated his injuries, the blunt force trauma was his ultimate cause of death. In view of the facts, we have no hesitation in concluding that the victim's death was caused by the unlawful acts of the Appellants. Thus, the evidence is sufficient to support Appellant Buford's convictions of first degree felony murder.

As to Appellant Buford's claim that the evidence is insufficient to support his conviction of especially aggravated kidnapping because it fails to show that the victim's removal or confinement exceeded that necessary to commit the aggravated robbery, we initially note that the trial court properly instructed the jury pursuant to State v. White,

362 S.W.3d 559 (Tenn. 2012). In <u>White</u>, our supreme court held, "To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case." 362 S.W.3d at 580. In order for the jury to make that determination, the court offered the following instruction:

> [Y]ou may consider all the relevant facts and circumstances of the case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;
>
> • whether the removal or confinement occurred during the commission of the separate offense;
>
> • whether the interference with the victim's liberty was inherent in the nature of the separate offense;
>
> • whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;
>
> • whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
>
> • whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

<u>Id.</u> at 580-81.

Taken in the light most favorable to the State, the evidence shows that after Appellant Buford beat the victim into unconsciousness and Appellant Hopkins removed the victim's money from the victim's wallet, Appellant Hopkins dragged the still-unconscious victim into the bathroom and bound him with neckties. The victim remained in the bathroom until he was found the next day. The factors listed by our supreme court in the <u>White</u> instruction support a reasonable jury's concluding that the victim's removal or confinement was to a greater degree than that necessary to commit the offense of

aggravated robbery. Accordingly, the evidence is sufficient to support Appellant Buford's conviction of especially aggravated kidnapping.

### E. Cumulative Error

Finally, Appellant Buford contends that he is entitled to relief based upon cumulative error. We have concluded that the State gave improper closing argument and that the trial court erred by failing to give a limiting instruction pursuant to <u>Bruton</u> but that the errors were harmless. Given the proof against the Appellant, we conclude that the cumulative effect of the errors is still harmless. Therefore, he is not entitled to relief on this issue.

### **III. Conclusion**

Based upon the oral arguments, the record, and the parties' briefs, we find no reversible error and affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE